Ronald E. VAN LANINGHAM, Plaintiff,

v.

Michael J. ASTRUE [1], Commissioner of Social Security, Defendant.

No. 4:06–cv–452 RWP–TJS.

United States District Court, S.D. Iowa, Central Division.

July 25, 2007.

1. Michael J. Astrue became the Commissioner of Social Security on February 1, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Linda McMahon as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

H. Edwin Detlie, Jr., Detlie Law Office, St. Ottumwa, IA, for Plaintiff.

Gary L. Hayward, United States Attorney, Des Moines, IA, for Defendant.

## ORDER

PRATT, Chief Judge.

Plaintiff, Ronald E. Van Laningham, filed a Complaint in this Court on September 21, 2006, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed an application for Social Security Disability benefits on July 16, 2004. Tr. at 52–55. Plaintiff claimed to have become disabled March 1, 2004. Tr. at 52. After the application was denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Jean M. Ingrassia (ALJ) on September 27, 2005. Tr. at 219–53. The ALJ issued a Notice Of Decision—Unfavorable on March 30, 2006. Tr. at 9–20. On August 18, 2006, the Appeals Council declined to review the ALJ's decision, making it the final decision of the Commissioner in this case. Tr. at 3–6. Plaintiff filed his Complaint in this Court on September 21, 2006. Plaintiff is insured for disability benefits until the end of December, 2008. Tr. at 56.

In her decision, the ALJ found Plaintiff had not engaged in substantial gainful activity since his alleged onset of disability. The ALJ found that Plaintiff has severe impairments consisting of degenerative disc disease, chronic low back pain, status post right foot hallux [2] cheilectomy [3], new onset left heel plantar faciitis, history of chronic obstructive pulmonary disease, and dysthymic disorder. Tr. at 14. The ALJ found that none of these impairments, alone or in combination, meet or equal a listed impairment. Tr. at 16. The ALJ found that Plaintiff has the residual functional capacity to perform "a slightly restricted" range of light work. Tr. at 17.

X-rays of Plaintiff's right foot dated February, 23, 2004, showed degenerative arthritic changes at the first metatarsal phalange. Tr. at 131. X-rays of Plaintiff's left foot taken on June 21, 2004, showed plantar spur formation in the calcaneum. The exam was otherwise unremarkable. Tr. at 128.

Plaintiff saw Joseph Galles, Jr., M.D. on March 12, 2004. Plaintiff had a long standing history of slight stiffness of his great toes. About three weeks before the exam, Plaintiff sustained a direct blow to the right toe, and thereafter experienced persistent pain, exacerbated by weight bearing. Dr. Galles gave Plaintiff an injection after which Plaintiff had incomplete resolution of symptoms, but the motion was a bit better. Tr. at 169. When Plaintiff returned on April 1, 2004, any attempt to move the toe produced severe pain, and the doctor wrote that osteophytes were palpable. Plaintiff told the doctor that he wanted to proceed with surgery. Tr. at 168. Four days after the surgery, Plaintiff reported that he no longer needed to take his pain medication. On April 15, 2004, Plaintiff was working on some gentle range of motion exercises. Tr. at 167. When Plaintiff saw Dr. Galles on May 7, 2004, "remarkably good motion" had returned to the toe and Plaintiff was pain free. Plaintiff was told to return to the clinic in a month or two if he had any pain, otherwise only if needed. Tr. at 166. Plaintiff returned on July 2, 2004, complaining of pain in his left heel. X-rays showed a small heel spur. Examination of Plaintiff's right foot showed only mild pain beyond 30 to 40 degrees of extension. Because of the new problem with the left foot, the doctor prescribed an anti-inflammatory medication. Plaintiff reported his chronic back problems and was referred to Cassim Igram, M.D. at the same clinic.

Plaintiff saw Dr. Igram on July 16, 2004. Tr. at 165. Plaintiff said that sitting made his pain worse, and that he had no problems walking. The doctor wrote that he reviewed the results of an MRI which showed "some moderate central canal stenosis at L4–5 and some degenerative arthritis more than expected for a 49 year old male." Dr. Igram opined that surgery would not help Plaintiff. Plaintiff was given samples of Celebrex to see if it provided relief. Tr. at 164.

Kurt A Smith, D.O. of Orthopaedic Center wrote to Dorothy W. Cline Campbell, D.O. that Plaintiff was seen August 18, 2004. Tr. at 149–151. Plaintiff was described as a 49-year-old man who was being seen at the request of Cassim Igram, M.D. (see Tr. at 164). Plaintiff had chronic back pain for 15 years. He had a history of being a truck driver for several years with two motor vehicle accidents.

---

**2.** Hallux: Great toe. Stedman's Medical Dictionary, 27th Edition.

**3.** CHEILECTOMY (k-lek't-mç): 1. Excision of a portion of the lip. 2. Chiseling away bony irregularities at osteochondral margin of a joint cavity that interfere with movements of the joint. Stedman's Medical Dictionary, 27th Edition.

Plaintiff described his pain as an aching in the low back region which was increased with prolonged sitting. Plaintiff also said that prolonged sitting caused some numbness in his legs. The doctor noted that Plaintiff had a foot surgery in 2004, and lung surgery in 1997. Tr. at 149. The doctor wrote that the MRI in his chart demonstrated significant degenerative disk disease involving all levels of the lumbar spine. Dr. Smith advised Plaintiff that he had a chronic ongoing problem with only symptomatic relief. Tr. at 150.

On August 22, 2004, Plaintiff underwent an MRI of his lumbar spine at the request of his physician, Dr. Cline Campbell. Tr. at 126–27. Thomas D. Berg, M.D., wrote that the study showed multilevel degenerative disc disease, most severe at L4–5 with a severe degree of central canal stenosis. Tr. at 127.

On November 5, 2004, Plaintiff underwent a psychological evaluation by Kevin Krumvieda, Ph.D. Tr. at 170–72. Plaintiff's work history began at a foundry while still in high school. After working on road and bridge construction for four years, he began raising hogs and farming. For four years worked at a hog buying station. Plaintiff bought a tractor-trailer and was an over-the-road driver for thirteen years. He worked on a farm for a couple of years and then went to work for a large hog corporation. Plaintiff said he stopped working in March 2004 due to his back and foot problems. Tr. at 170. Plaintiff told Dr. Krumvieda that he was drinking a case of beer per week "on average." Plaintiff said that he lives alone, but has help with housecleaning. He said that in the past he enjoyed cooking, but is no longer able to stand for any length of time. He told the doctor that if he is up for an hour, he must lie down. On mental status exam the Beck Depression Inventory, Second Edition was administered. Plaintiff said that he had a "pessimistic view of life"

since his adolescence. When asked how his drinking affects his depression, he said that he used alcohol for pain relief. The Mini–Mental Status Exam, showed none to little cognitive impairment. Tr. at 171. The Substance abuse Subtle Screening Inventory indicated a high probability that he has a substance dependence disorder. Dr. Krumvieda also said that Plaintiff's profile suggests that he is experiencing emotional pain consistent with his self-reported depression on the Beck Depression Inventory. The Axis I diagnoses were: Dysthymic disorder; mood disorder due to current back and foot pain, and alcohol abuse (provisional). There was no Axis II diagnosis. The doctor opined that Plaintiff's depression was of longstanding duration and was exacerbated by his medical conditions. "He appears to be self-medicating with alcohol (beer). Dr. Krumbieda wrote:

Regarding work-related activities, Mr. VanLaningham's ability to understand instructions, procedures and locations appears mildly to moderately impaired given his performance on the MMSE and his somewhat difficult time finding this center. His ability to maintain attention, concentration and pace appears moderately to markedly impaired given his performance on the MMSE, his current level of depression and his self-reported medical history with reduced functioning in activities of daily living. His ability to interact appropriately with supervisors, co-workers and the public appears moderately to markedly impaired given his current level of depression. His ability to use good judgment and respond appropriately to changes in the work place appears moderately to markedly impaired, again given his depression and his use of alcohol to self-medicate."

Dr. Krumvieda closed his report by recommending a psychiatric consult to manage Plaintiff's depression. Tr. at 172.

On July 19, 2005, Plaintiff saw Veronica W. Butler, M.D., for a physical examination. Tr. at 205–07. On physical exam, Plaintiff was unable to walk on his toes. He had decreased flexion of lumbar sacral spine. Straight leg raising was positive at 20 degrees. He had lumbar sacral spine point tenderness. He had decreased range of motion of both shoulders. Tr. at 206. Dr. Butler's assessment was:

> There was marked lack of symptom magnification. The patient is quite honest about his problems and the physical exam confirms as well as x-rays and MRI's (sic) that he's brought with him the above diagnoses. This patient should not be expected to sit for longer than 15 minutes. He definitely should not be in a position that would require any lifting. I expect his problems to progress as time goes on. He should do no overhead work or be expected to ride or drive a car for more than 20 minutes. I do not expect any improvement in the future and he would only qualify for very sedentary work.

Tr. at 207.

On July 11, 2005, Plaintiff was seen for an initial assessment by Stephen E. Prettyman, M. S.W. on referral from Dr. Krumvieda. Plaintiff reported despair, anxiety, worry, and interrupted sleep and general loss of activity due to pain. On mental status exam, it was noted that Plaintiff walked with great difficulty and slowness. During the interview, Plaintiff changed positions and stood often. His motor function was restricted by pain. Mr. Prettyman's diagnoses were dysthymic disorder and mood disorder due to back/foot pain. Tr. at 214. On August 23, 2005, Plaintiff was seen for an initial outpatient psychiatric evaluation by Christopher Okiishi, M.D. Tr. at 208–09. Dr. Okiishi's Axis I diagnosis was dysthymic disorder with superimposed depressive disorder secondary to chronic pain, history of alcoholism. The doctor prescribed Lunesta and Lexapro. Tr. at 208.

At the hearing, Plaintiff testified that he could sit in a chair for a couple hours a day if he only needed to sit for about 15 minutes at a time. Tr. at 231. He said he could walk "maybe a city block," after which his back and feet hurt. He said that he wouldn't want to walk a block more than a couple times per day. He said that he could not stand longer than 15 to 20 minutes for a total of two hours per day. Tr. at 232. Plaintiff said that if he holds a pencil or pen too long, or if he uses a computer mouse, or uses a computer key board more than about 10 or 15 minutes his hands begin to go numb. Tr. at 233–34. Plaintiff said that he agreed with Dr. Butler's assessment of his ability to lift, and that a gallon of milk is his limit. Plaintiff said that he lies down about an hour in the morning and about a half hour in the afternoon "just to take the pressure off my back." Tr. at 235. Plaintiff said that he last used alcohol several months before the hearing: "It's got to where my stomach won't tolerate it at all ..." Tr. at 237. He said that a neighbor helps him clean his house. Tr. at 238.

The ALJ asked Plaintiff if he thought he could do a light driving job, such as a shuttle bus driver or bookmobile driver or a car jockey job, none of which would require lifting the kind of weight he lifted as an over-the-road driver. Plaintiff responded that the round trip between the hearing site and his home, a trip of about 20 minutes, was all he could tolerate in a day. Tr. at 241–42. Plaintiff told the ALJ that he lives on 3 acres of land but he only mows a small part of it. The rest is mowed by a neighbor a couple times a year with a tractor. Tr. at 243.

At the hearing, the ALJ invited counsel to ask the first hypothetical questions. Tr. at 244. Jeff Johnson was sworn in as the vocational expert (VE). Tr. at 245. The first question was:

Assuming the individual whose past relevant work is described in Exhibit 9E (Tr. at 116) and assume the individual is 48 to 50 years old. I would like you to, further assume that the individual has a GED, has a history of radiographically established degenerative disk disease and arthropathy in the, in the lumbar spine resulting, as well as a, a moderate to severe degree of central canal stenosis established by MRI, heel spurs on the left foot and degenerative joint disease in both feet with surgery on the right foot last year and further with diagnosis of depression. I would ask you to assume that the individual could sit up to 15 minutes at a time for up to two hours spread out throughout an eight hour day, could stand for 15 to 20 minutes at a time for 2 hours out of an eight hour day, could walk for a block up to twice a day, could occasionally carry five pounds, no frequent lifting or carrying, no ladders or scaffolds, could not climb a flight of stairs but could climb a few steps at one time on an occasional basis, no bending at the waist, could occasionally crouch and kneel, no overhead lifting according to Dr. Butler, could use his hands for 15 minutes at a time for up to two hours out of an eight hour day.

Tr. at 246. In response, the VE testified that the hypothetical would preclude all work activity. Tr. at 246–47. Next, counsel asked:

As a second hypothetical, I would ask that you assume an individual who is limited to light work and that individual was moderately impaired in the ability to understand and carry out instructions, moderately impaired two-thirds of the day, markedly impaired one-third of the day. Likewise, moderately impaired in maintaining attention, concentration and pace two-thirds of the day, markedly impaired one-third of the day. The same with interacting with coworkers and supervisor moderately impaired two-thirds of the day, markedly impaired one-third of the day and the, same for using good judgment or responding appropriately to change in the workplace. Moderate would be defined as significant difficulty but retains the ability to function. Marked impairment would be defined as not having the ability to function in those areas. With those restrictions, would that individual be able to return to past relevant work?

The VE responded that the limitations would preclude all competitive employment. Tr. at 247. Thereafter, the ALJ asked:

If we found that he was diagnosed with a dysthymic disorder in Exhibit 1 1f [Tr. at 208], rather than a depressive disorder, and if we found that this particular depressive disorder would only mildly interfere with his ability to function independently, appropriately and effectively in the competitive job market on a sustained basis, and if we found that he has no marked limitations whatsoever from a mental point of view in terms of his activities of daily living, his social functioning, his concentration, persistence and pace, but rather only mild limitations in those areas and if we found that the surgery that he had on his foot improved his condition, that heel spurs is a condition that can be treated and cured and that his back condition is a condition that he has had for the past 20 years and he was able to work despite that condition, but that it would limit him to occasional lifting of 20 pounds, frequent lifting of 10 pounds, sitting, standing or walking with normal breaks in an eight hour work day, occa-

sional climbing, balancing, stooping, kneeling, crouching and crawling, no manipulative visual communicative or environmental limitations, would he be able to perform his past work activity?

Tr. at 248. The VE responded that such an individual would not be able to do Plaintiff's past relevant work and would only be able to do unskilled work. Tr. at 248. The ALJ asked: "I think I brought up about light shuttle bus driver, mobile bus driver, car jockey, parking lot driver. Are those jobs unskilled?" The VE responded that the jobs were unskilled and some were light and some medium. Tr. at 248. The ALJ asked the vocational expert to look up DOT number 915.473–010 which the vocational expert said was the light unskilled job of parking lot attendant. He said it would be appropriate under the ALJ's hypothetical. Next, the ALJ read 913.663–014 which the VE said was a light semi-skilled job of mobile lounge driver. Tr. at 249. The VE testified that the job of shuttle bus driver is a medium semi-skilled job. The VE then pointed to other jobs such as deliverer outside, and chauffeur. Tr. at 250. The VE told the ALJ that her hypothetical encompassed essentially a full range of unskilled light job activities. Tr. at 251.

Plaintiff argues the ALJ committed four errors which require reversal or remand. First, he argues the ALJ erred in failing to properly credit the opinions of treating physician, as well as the consulting and reviewing psychologists. Second, that the ALJ made an improper credibility finding regarding Plaintiff's testimony. Third, that the ALJ failed to acknowledge the shift in the burden of proof after finding Plaintiff is unable to return to past relevant work. Finally, that the ALJ relied on an improper hypothetical which did not take into account all of Plaintiff's impairments and limitations.

## DISCUSSION

 Our role on review is to determine if the Commissioner's findings are supported by substantial evidence on the record as a whole. *Baker v. Barnhart*, 457 F.3d 882 (8th Cir.2006.); *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion. *Lacroix v. Barnhart*, 465 F.3d 881 (8th Cir.2006). In considering the evidence, we must consider both evidence that supports and evidence that detracts from the Commissioner's decision. *Karlix v. Barnhart*, 457 F.3d 742, 746 (8th Cir.2006). We will disturb the ALJ's decision *only* if it falls outside the available "zone of choice." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir.2006). An ALJ's decision is not outside the "zone of choice" simply because we might have reached a different conclusion had we been the initial finder of fact. *Id.* Consequently, we may not reverse the decision to deny benefits unless the record contains insufficient evidence to support the outcome. *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir.1994).

*Nicola v. Astrue*, 480 F.3d 885, 886–87 (8th Cir.2007.)

 In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir. 1975).

 It is the statutory duty of the ALJ, in the first instance, to assess the credibility of the claimant. *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir.2004). Nevertheless, a credibility finding, like any other finding, must be supported by substantial evidence on the record as a whole. *See Cox v. Barnhart*, 345 F.3d 606, 610–11 (8th

Cir.2003) holding that the ALJ's discrediting of claimant's and her witnesses' testimony was improper because that testimony was consistent with the medical record.

█ In the case at bar, the Court can not find substantial evidence which supports the finding that Plaintiff is not fully credible. Among the reasons the ALJ gave for not fully believing Plaintiff was that no doctor had advised surgery on his back. The doctor did not state that surgery was not necessary because Plaintiff had a minor problem. It was that surgery would not correct the "multi level degenerative disk disease more severe L–4, L–5 with a severe degree of central canal stenosis." Tr. at 205.

█ The ALJ was concerned that Plaintiff was not using prescription to control his pain. He testified, however, that the medication which his doctors had prescribed was not as effective as over-the-counter Tylenol. Although the lack of prescription pain medication is a significant factor when assessing credibility, in this case there is no evidence that prescription medication would restore Plaintiff's ability to work.

The ALJ wrote: "... the claimant admits that he can do light housework, although more slowly than he had previously (exhibit 1 E, p. 3 (Tr. at 77)). The Claimant prepares his own meals, does weekend laundry, although he cannot vacuum (exhibit 3E, p. 3(85)). The claimant feeds and waters his dog, lives alone and cares for his own personal bathing, etc (exhibit 3E, p. 2 (Tr. at 84))." Tr. at 18. In *Draper v. Barnhart,* 425 F.3d 1127, 1131 (8th Cir. 2005), the Court wrote:

> The fact that Draper tries to maintain her home and does her best to engage in ordinary life activities is not inconsistent with her complaints of pain, and in no way directs a finding that she is able to engage in light work. As we said in *McCoy v. Schweiker,* 683 F.2d 1138,

1147 (8th Cir.1982)(en banc), the test is whether the claimant has "the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real world." In other words, evidence of performing general housework does not preclude a finding of disability. In *Rainey v. Dep't of Health & Human Servs.,* 48 F.3d 292, 294 (8th Cir.1995), the claimant washed dishes, did light cooking, read, watched TV, visited with his mother, and drove to shop for groceries. We noted that these were activities that were not substantial evidence of the ability to do full-time, competitive work. In *Baumgarten v. Chater,* 75 F.3d 366, 369 (8th Cir.1996), the ALJ pointed to the claimant's daily activities, which included making her bed, preparing food, performing light housekeeping, grocery shopping, and visiting with friends. We found this to be an unpersuasive reason to deny benefits: "We have repeatedly held ... that 'the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.'" *Id.* (quoting *Hogg v. Shalala,* 45 F.3d 276, 278 (8th Cir.1995)). Moreover, we have reminded the Commissioner that to find a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.... The ability to do light house work with assistance, attend church, or visit with friends on the phone does not qualify as the ability to do substantial gainful activity. *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989) (citations omitted).

In *Ricketts v. Secretary of Health and Human Services,* 902 F.2d 661, 663 (8th

Cir.1990), the Court wrote: "Ricketts' ability to carry out the trash occasionally or to spend one hour mowing his lawn is not substantial evidence that he can spend much of an eight hour work day walking or standing." Likewise, in the case at bar, the ALJ's credibility finding is neither supported by substantial evidence nor is it within the zone of reasonable choice.

■ In addition to all of the aforementioned, "a claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Nunn v. Heckler*, 732 F.2d 645, 648 (8th Cir.1984). In this case, Plaintiff's work history speaks in his favor.

■ The Court agrees with Plaintiff that the ALJ improperly disregarded the opinions of the physicians who treated and/or examined Plaintiff. The medical reports are unanimous in finding a "marked lack of symptom magnification." At the same time, the doctors are clear that Plaintiff is unable to sit, stand, walk and lift long enough to engage in substantial gainful activity. Dr. Butler's opinion is based on the objective medical evidence of the extent of the arthritis in Plaintiff's back. In *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir.1990), the Court stated that it is the law of the circuit that the ALJ "must not substitute his opinion for those of the physician." The Court of Appeals has also held that mental diagnoses should be made by psychologists and psychiatrists, not ALJs, or district or appellate court judges.

■ Finally, the Court agrees with Plaintiff that the ALJ relied on a faulty hypothetical question which failed to take into account the extent of Plaintiff's physical and mental impairments. The Court of Appeals has: "repeatedly held that vocational testimony elicited by hypothetical questions that fail to relate with precision the physical and mental impairments of the claimant cannot constitute substantial evidence on the record as a whole." *Ness v. Sullivan*, 904 F.2d at 436. More recently, in *Wilson v. Astrue*, 493 F.3d 965, 967, 2007 WL 2050836 at *3 (8th Cir.2007), the Court wrote: "Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." (quoting *Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 365 (8th Cir.2007)). The two questions asked by counsel capture the concrete consequences of Plaintiff's impairment, both physical and mental. The ALJ's hypothetical questions, on the other hand, are unsupported by any substantial evidence. The ALJ did not explain how she arrived at her assessment of Plaintiff's residual functional capacity. She simply found that because she did not find his testimony credible, he could do light work. Drawing a conclusion regarding credibility, however, is not equivalent to proving that a claimant has a residual functional capacity, which must be supported by medical evidence. *Soth v. Shalala*, 827 F.Supp. 1415, 1417 (S.D.Iowa 1993).

■ The Court also agrees with Plaintiff that failure to acknowledge the shift in the burden of proof is reversible error. *See Pope v. Bowen*, 886 F.2d 1038, 1040 (8th Cir.1989), in which the Court wrote:

> As the Secretary recognizes, we have frequently declared that the ALJ must expressly acknowledge the shift in the burden of proof and if the ALJ does not do so, we will not assume that the ALJ implicitly shifted the burden of proof. This failure to shift the burden of proof constitutes reversible error unless all of the evidence is so strongly against the claimant's position that a proper allocation of the burden of proof would not have changed the outcome. [citations omitted]

 In *Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir.1987), the Court wrote: "Ordinarily, where the Secretary has incorrectly allocated the burden of proof ... we will remand for further proceedings. However, where the total record is overwhelmingly in support of a finding of disability, and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand." In the case at bar, substantial evidence on the record as a whole demonstrates that Plaintiff's arthritic back prevents him from performing more than the most sedentary of work activity. When the vocational expert was asked to consider this condition along with the other mental and physical impairments established in the record, it was his testimony that no work is possible. A remand with an order to award benefits is, therefore, the appropriate remedy.

### CONCLUSION AND DECISION

It is the holding of this Court that the Commissioner's decision is not supported by substantial evidence on the record as a whole. The case is reversed and remanded for payment of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b)[4]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996

(2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

---

**4.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."

**1.** Michael J. Astrue became the Commissioner of Social Security on February 1, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for Commissioner Linda McMahon as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).